| | |
|---|---|
| M/V ADMIRAL BULKER, *in rem* | CIVIL ACTION |
| VERSUS | NO. 16-16215 c/w 16-17745 |
| UNITED BULK TERMINALS DAVANT, *et al.* | SECTION: M (2) *Pertains to all cases* |

## ORDER & REASONS

Before the Court is an unopposed motion for summary judgment filed on behalf of Ingram Barge Company, LLC ("Ingram").[1] Also before the Court are two other motions for summary judgment: (1) one filed on behalf of Camellia Maritime, S.A., *in personam* and as claimant of the *M/T Kokuka Glorious* ("*Kokuka Glorious*"), *in rem*, Bernhard Schulte Singapore, Kokuka Sangyo Co., Ltd., and the Japan Ship Owners Mutual Protection and Indemnity Association (collectively, "*Kokuka Glorious* Interests"),[2] to which United Bulk Terminals Davant, LLC ("UBT"),[3] Lua Line/Okino Kaiun, *Q Jake* Shipping Ltd., QBE Insurance Singapore PTE Ltd., Quanzhou Fortune Sea Oils and Grain Industries, Co., Ltd., and the *Serena P* Stefan Patjens (collectively, "Vessel and Cargo Interests"),[4] Marquette Transportation Company Gulf-Inland, LLC ("Marquette"),[5] and Eurex Bulker, S.A. ("Eurex"), *in personam*,[6] respond in opposition, and in further support of the

---

[1] R. Doc. 147.
[2] R. Doc. 148.
[3] R. Doc. 156.
[4] R. Doc. 158. The Vessel and Cargo Interests adopt in part UBT's memorandum in opposition to the motion for summary judgment filed by the *Kokuka Glorious* Interests together with UBT's statement of contested material facts (R. Doc. 156) to the extent UBT argues and shows facts that support a finding of liability on the part of the *Kokuka Glorious* Interests, but do not incorporate or adopt and expressly deny argument and facts that support a finding that UBT's barge mooring components were in good condition at the time of the incident and that the Plaquemines Port Tariff is preempted by U.S. Coast Guard regulations. R. Doc. 158 at 1-2. This Order & Reasons discusses UBT's position without further reference to the Vessel and Cargo Interests.
[5] R. Doc. 159.
[6] R. Doc. 162.

motion the *Kokuka Glorious* Interests reply,[7] and in further opposition UBT files a surreply;[8] and (2) a motion for summary judgment filed on behalf of Eurex, as claimant of the *M/V Admiral Bulker* ("*Admiral Bulker*"), *in rem* (collectively, "*Admiral Bulker* Interests"),[9] to which UBT,[10] the Vessel and Cargo Interests,[11] and Marquette[12] respond in opposition, and in further support of which the *Admiral Bulker* Interests reply.[13]  Having considered the parties' memoranda and the applicable law, the Court issues this Order & Reasons.

## I.    BACKGROUND

This consolidated action arises out of a breakaway incident and an ensuing series of collisions and allisions on the Mississippi River near Davant, Louisiana.  On January 20, 2016, the water level in an area of the Mississippi River near the barge fleet facility owned and operated by UBT was unusually high.[14]  At approximately 12:30 p.m., fifteen barges owned by Ingram[15] and Canal Barge Company, Inc. ("Canal Barge") broke away from UBT's barge fleet facility after a mooring line connecting a tier of fifteen barges to UBT's 1B Buoy parted.[16]  Twenty-two barges in total then drifted into the navigation channel,[17] collided with the southbound *M/V Q Jake*, owned by *Q Jake* Shipping Ltd., and the *M/V Serena P*, owned by *Serena P* Stefan Patjens, and allided with the anchored *M/V Ocean Tomo*, owned by Lua Line/Okino Kaiun, resulting in damage to the

---

[7] R. Doc. 171.
[8] R. Doc. 180.
[9] R. Doc. 149.
[10] R. Doc. 155.
[11] R. Doc. 157.  The Vessel and Cargo Interests adopt UBT's memorandum in opposition to the motion for summary judgment filed by the *Admiral Bulker* Interests together with UBT's statement of contested material facts (R. Doc. 155) and incorporate by reference UBT's arguments that support a finding of liability on the part of the *Admiral Bulker* Interests.  R. Doc. 157 at 1.
[12] R. Doc. 159.
[13] R. Doc. 177.
[14] R. Docs. 147-6 at 1.
[15] *Id.*
[16] *Id.* at 2; *see* R. Docs. 148-3 at 5; 149-2 at 2; 156-16 at 3
[17] R. Docs. 61 at 2; 148-3 at 5; 146-16 at 3; 159; 162-12 at 4.

vessels and cargo.[18]  Fleet tugs owned by Marquette, operator of the fleet boats at the UBT facility, responded to the breakaway.[19]

Two deep-draft vessels, the *Admiral Bulker*, a Marshall Islands flag bulk carrier owned by Eurex, and the *Kokuka Glorious*, a foreign Panamanian flag bulk carrier owned by Camellia Maritime, S.A., operated by Bernhard Schulte Singapore, and managed by Kokuka Sangyo Co., Ltd., had passed the barges prior to the breakaway.  Mississippi River Traffic Information Service ("MRTIS") data shows the *Admiral Bulker* as having passed the 1B Buoy at 11:50 a.m. as the ship proceeded upriver.[20]  At approximately 12:25 p.m., the *Kokuka Glorious*, proceeding downriver, passed the 1B Buoy.[21]  The sole witness to the breakaway was Captain Billy Brooks, operator of the crane barges at the UBT fleet facility, who was overlooking the fleet while manning a crane on a crane barge.[22]  Brooks testified to having seen a "red and black ship" (the same colors as the *Admiral Bulker*) proceeding upriver "around 12 o'clock" pass "pretty fast" at about 400 feet from the barges: "I was watching because ships don't normally pass that close."[23]  Brooks estimated that a five to six foot wave hit his barge, such that the wake "rocked my barge real, real hard" and caused a welder aboard his barge "to stop welding because it near[l]y knocked him off of the ladder."[24]  After he observed the barges breaking loose, Brooks called the captain of the *Marlene Ellis*, Marquette's lead boat in UBT's fleet, to report the incident, and the Marquette fleet responded to the breakaway.[25]  Brooks maintains that it was a northbound vessel that caused the wake rather than a southbound vessel.[26]

---

[18] *See* R. Doc. 154 (joint stipulation by all parties regarding quantum of damages).
[19] R. Doc. 147-6 at 1.
[20] R. Doc. 149-5.
[21] *See* R. Docs. 148-3 at 5 & 156-16 at 3.
[22] *See* R. Doc. 155-8 at 5-8.
[23] *Id.* at 7-9, 14-15, 24.
[24] *Id.* at 15, 18-19.
[25] *See id.* at 14; R. Docs. 149-5 at 18 & 149-5 at 40.
[26] R. Doc. 155-8 at 29.

What caused the 1B Buoy's mooring line to part is disputed, with the parties variously pointing to faults with the mooring system or to excessive wakes caused by the *Admiral Bulker* and *Kokuka Glorious* as they passed the fleet, or to both.[27] It is undisputed that no party has shown any fault or unseaworthy condition of any Ingram barge as causing or contributing to the breakaway, and that the Ingram barges were under the care, custody, and control of UBT as a fleeter when the barges were delivered to the UBT fleet on January 17, 2016, three days prior to the breakaway.[28]

Prior to the institution of this action, the *Admiral Bulker* posted nearly $4 million of security in the form of five letters of undertaking to avoid arrest.[29] On November 9, 2016, Eurex, as an *in rem* claimant of the *Admiral Bulker*, filed an action against UBT and the *Kokuka Glorious* Interests.[30] Thereafter, on December 22, 2016, the *M/V Q Jake*, the *M/V Serena P*, and their owners filed an action against UBT, Marquette, Canal Barge, Ingram, the *Admiral Bulker* Interests, and the *Kokuka Glorious* Interests ("the *Q Jake* and *Serena P* Action").[31] The actions were consolidated.[32]

The Vessel and Cargo Interests allege that the *Admiral Bulker* and the *Kokuka Glorious* passed the UBT facility at excessive speeds and caused or contributed to the breakaway. They also allege that the breakaway was caused by the fault of Ingram, UBT, Marquette, and Canal Barge, or that their fault contributed to the breakaway. In addition, the Vessel and Cargo Interests allege that Ingram delivered unseaworthy barges to the custody and care of UBT and Marquette,

---

[27] R. Doc. 147-6 at 2.
[28] R. Doc. 147-6 at 2-3. A fleeter is in the business of fleeting and mooring barges for hire.
[29] R. Doc. 61 at 2.
[30] R. Doc. 1 (Case No. 16-16215).
[31] R. Doc. 1 (Case No. 16-17745).
[32] R. Doc. 18.

and that Ingram failed to warn UBT and Marquette that the barges had latent and non-apparent defects.[33]

In the *Q Jake* and *Serena P* Action, the parties asserted several cross-claims. UBT,[34] Marquette,[35] and Canal Barge[36] brought cross-claims against the *Admiral Bulker* Interests and the *Kokuka Glorious* Interests. Ingram brought a cross-claim against UBT, the *Admiral Bulker* Interests, and the *Kokuka Glorious* Interests.[37] Camellia Maritime, S.A. brought a cross-claim against UBT, Marquette, and the *Admiral Bulker* Interests.[38] Eurex, as claimant of the *Admiral Bulker*, *in rem*, brought a cross-claim against UBT and the *Kokuka Glorious* Interests.[39] Generally, the claims against the *Admiral Bulker* Interests and the *Kokuka Glorious* Interests state that negligence in the navigation of the vessels caused and/or contributed to the breakaway. The claims against the barge interests state that UBT and/or Marquette negligently maintained the moorings, creating an unseaworthy condition that also caused and/or contributed to the breakaway, and that Marquette was negligent in responding to the breakaway.[40]

## II. PENDING MOTIONS

First, Ingram seeks summary judgment to dismiss the claims against it brought by the Vessel and Cargo Interests.[41] Ingram argues that, at all pertinent times, the Ingram barges were under the care, custody, and control of UBT as a bailee, and that discovery has shown that no fault or unseaworthy condition of any Ingram barge caused or contributed to the breakaway. Therefore,

---

[33] R. Docs. 57 at 5-10 & 109 at 5-10 (Case No. 16-16215); 1 at 5-9, 11-14 (Case No. 16-17745).
[34] R. Doc. 89.
[35] R. Docs. 41, 60, 85.
[36] R. Doc. 49, 126.
[37] R. Doc. 5 (Case No. 16-17745).
[38] R. Doc. 6 (Case No. 16-17745).
[39] R. Doc. 64.
[40] *See, e.g.*, R. Docs. 1, 41, 42, 49, 55, 57, 58, 60, 63, 64, 65, 76, 85, 88, 89, 90, 92, 93, 109, 110, 125, 126 (Case No. 16-16215); R. Docs. 1, 4, 5, 6 (Case No. 16-17745).
[41] R. Doc. 147.

Ingram asserts that it cannot be found liable for the damages sustained.[42]  Ingram's motion for summary judgment is unopposed.

Second, the *Kokuka Glorious* Interests seek summary judgment to dismiss all claims against them on the grounds that no claimant can show that the ship's wake was unusual or excessive.[43]  The *Kokuka Glorious* Interests posit that the ship's master and pilot testified that the wake of the *Kokuka Glorious* was minimal,[44] and that their expert demonstrated that the *Kokuka Glorious*' "median speed" was less than 62% of the 572 vessels that passed the UBT facility during high water conditions from January 1-20, 2016, and its "separation distance of more than 1300 feet from UBT's 1B buoy was more than 90% of the 572 vessels."[45]  Therefore, the *Kokuka Glorious* Interests submit that no claimant can prove that the wake was unusual or excessive.[46] The *Kokuka Glorious* Interests further argue that insufficient evidence exists to prove that its wake caused the breakaway and that claimants cannot show that the barges were properly moored to withstand normal and expected wakes, swells, and waves.  Finally, the *Kokuka Glorious* Interests maintain that a presumption of fault exists against UBT and Marquette as the custodians of moored vessels that broke away.[47]

Third, the *Admiral Bulker* Interests move for summary judgment in their favor on all claims asserted against them in the *Serena P* and *Q Jake* Action.[48]  The *Admiral Bulker* Interests contend that three undisputed facts absolve them from liability: (1) that the *Admiral Bulker* passed abeam the subject barge tier 1B at 11:50 a.m.; (2) that the *Kokuka Glorious* passed abeam the subject

---

[42] R. Doc. 147-1.
[43] R. Doc. 148-1 at 14-15.
[44] *Id.* at 7.
[45] *Id.* at 9, 16.
[46] *Id.* at 16.
[47] *Id.* at 16-21.
[48] R. Doc. 149 at 1.

barge tier 1B at 12:25 p.m.; and (3) that the 1B barge tier breakaway occurred at 12:30 p.m.[49]  The *Admiral Bulker* Interests essentially argue that the timing of the vessels' passage, where the *Admiral Bulker* passed the barges forty minutes before the breakaway occurred, negates the possibility that the *Admiral Bulker* could have caused or contributed to the breakaway.[50]  The *Admiral Bulker* Interests further contend that the Court should discount the August 14, 2018 deposition testimony of Billy Brooks, the sole witness to the incident, wherein he estimated that the breakaway occurred at approximately 12:00-12:05 p.m.  The *Admiral Bulker* Interests point to the U.S. Coast Guard Traffic Control's AIS ECDIS recordings, the MRTIS recordings, the radar feed from the *Q Jake*'s VDR, and Brooks' cell phone records, which reflect that the incident occurred at 12:30 p.m.; and further argue that Brooks' earlier 2016-2017 declarations, wherein he acknowledged or stated that the incident happened around 12:30 p.m., are more persuasive as being closer in time to the incident.[51]

In opposing the *Kokuka Glorious* Interests' motion for summary judgment, the *Admiral Bulker* Interests essentially re-urge the reasons supporting their own motion for summary judgment.  The *Admiral Bulker* Interests contend that their experts' studies of passing ships, along with the MRTIS recordings, confirm that both vessels were traveling at safe speeds and distances from the barges, creating wakes of two feet at most, in contradiction to Brooks' estimation of distance and a five-foot wave.[52]  Thus, the *Admiral Bulker* Interests maintain that UBT's negligence in properly maintaining its fleet was the sole cause of the breakaway.[53]  But if fault is ascribed to a vessel, the *Admiral Bulker* Interests contend it must be laid to the *Kokuka Glorious*.

---

[49] R. Doc. 149-3 at 2-9.
[50] *Id.* at 13-16.
[51] *Id.* at 8-12, 15-16.
[52] R. Doc. 162 at 3-9 (citing R. Docs. 162-4, 162-8, 162-9, 162-10).
[53] *Id.* at 2-3, 12.

The *Admiral Bulker* Interests maintain that, given the timing of the breakaway, Brooks must be mistaken about the direction of travel of the vessel he says caused the wake he observed, and thus they insist that it must have been the downbound *Kokuka Glorious*, and not the upbound *Admiral Bulker*, that created the wake.[54]

In opposing both motions, UBT asserts that summary judgment is inappropriate because significant evidence exists to trigger the burden-shifting *Pennsylvania* Rule as to both vessels, and that disputes of material fact otherwise preclude summary judgment. UBT contends that the *Kokuka Glorious* and the *Admiral Bulker* failed to abide by U.S. Coast Guard regulations and a U.S. Army Corps of Engineers directive requiring a vessel to proceed slowly and exercise extreme caution in high-water conditions when passing structures subject to damage from wave action or wave wash.[55] Additionally, UBT notes authorities imposing upon the ship's master a duty to monitor the actions of a compulsory pilot and to intervene, when necessary, to prevent the ship from straying into danger.[56] UBT points to evidence of what it says shows each vessel's violation of applicable regulations and duties. For example, UBT emphasizes that the *Kokuka Glorious* accelerated through the channel,[57] traveling at "sea speed" as the ship was passing the UBT barge facility,[58] a speed faster than what its pilot testified to be customary near UBT's facility due in part to the congestion of barges there[59] and faster than that prescribed by the voyage passage plan for the *Kokuka Glorious*,[60] and that its captain admitted he was not aware of any reason he should have decreased the vessel's speed as the *Kokuka Glorious* passed the UBT facility.[61] UBT also

---

[54] *Id.* at 8-11.
[55] R. Docs. 155 at 2-7 & 156 at 2-6.
[56] R. Docs. 155 at 7-9 & 156 at 7-9.
[57] R. Doc. 156 at 9 (citing R. Doc. 148-2 at 76).
[58] *Id.* at 10 (citing R. Doc. 156-4 at 4-5, 7).
[59] *Id.* (citing R. Doc. 156-3 at 3-4).
[60] *Id.* at 10-11 (citing R. Doc. 156-5).
[61] *Id.* at 11 (citing R. Doc. 156-4 at 2-3, 8).

argues that the barges were properly moored.[62]  As to the *Admiral Bulker*, UBT notes that its master, Captain Artemio Calaranan, and compulsory river port pilot, Captain Brian Bagley, did not recall discussing a plan to take into account the conditions of the river on the day of the incident;[63] that Captain Calaranan could not recall any structures or facilities in or near the UBT facility or the location of the barges;[64] and that the *Admiral Bulker* operated at full speed but that Captain Calaranan never demanded the pilot to slow and admitted to being unaware as to the effect the high current had on the barges that were fleeted on the river as the ship passed.[65]  Moreover, UBT argues that Brooks' deposition testimony actually identified the *Admiral Bulker* as the upriver ship at fault, having passed near the barges "around 12 o'clock."[66]  UBT says that the *Admiral Bulker* Interests critically omit Brooks' deposition testimony that recalls an ***upbound*** vessel causing the breakaway because it is undisputed that the *Admiral Bulker*, not the *Kokukas Glorious*, traveled upbound on that day.[67]  UBT further contends that the out-of-court statements relied upon by the *Admiral Bulker* Interests to discredit Brooks' 2018 deposition testimony should be rejected as inadmissible hearsay.[68]  As a consequence of these disputed material facts, UBT urges the Court to deny summary judgment.[69]

Like UBT, Marquette opposes the motions for summary judgment on the grounds that disputes of material fact preclude the *Admiral Bulker* Interests and the *Kokuka Glorious* Interests from overcoming the *Pennsylvania* Rule.[70]  Marquette also points to testimony of Captains Calaranan, Bagley, and Williams, and Darwin Enraca, the *Kokuka Glorious*' master, that suggest

---

[62] *Id.* at 12-21.
[63] R. Doc. 155 at 9-10 (citing R. Docs. 155-4 at 4, 6, 24 & 155-5 at 4-6).
[64] *Id.* at 10 (citing R. Doc. 155-4 at 14-18).
[65] *Id.* at 10-13 (citing R. Doc. 155-4 at 17, 19, 21, 23).
[66] *Id.* at 155 at 13-18 (citing R. Doc. 155-8 at 6).
[67] *Id.* at 15-17.
[68] *Id.* at 18-22.
[69] *Id.* at 23.
[70] R. Doc. 159 at 10-15.

their ignorance of the need to proceed with caution in the circumstances, as well as MRTIS screenshots indicating that the ships did not slow as they passed the facility.[71]  Marquette further argues that Brooks' testimony, while seemingly internally inconsistent, reveals that "Brooks was certain the offending vessel was an upbound vessel; he was less certain regarding the timing of the breakaway."[72]

Replying in support of their motion for summary judgment, the *Kokuka Glorious* Interests essentially argue that the *Pennsylvania* Rule is inapplicable for two reasons: first, because the undisputed evidence as to the *Kokuka Glorious*' speed, distance, and negligible wake dispenses with the need for a presumption of fault; and second, because the *Pennsylvania* Rule "applies only to violations of statutes that delineate a clear legal duty, not regulations that require judgment and assessment of a particular circumstance," and thus not here, where the regulations cited by UBT and Marquette require the exercise of judgment and assessment of particular circumstances.[73]  The *Kokuka Glorious* Interests insist that summary judgment on their behalf is warranted because claimants cannot carry their burden of proving that the *Kokuka Glorious* produced an unusual or excessive wake or that negligence in operating the vessel caused or contributed to the accident, again emphasizing Brooks' testimony that the *Kokuka Glorious* Interests claim unequivocally identified a vessel traveling upriver (and thus, necessarily, the *Admiral Bulker*) as the sole cause of the breakaway.[74]

In its surreply in opposition to the *Kokuka Glorious* Interests' motion for summary judgment, UBT argues that the *Pennsylvania* Rule applies because the *Kokuka Glorious* Interests

---

[71] *Id.* at 6-10 (citing R. Docs. 159-23 at 5-15; 159-24 at 3-5; 159-25; 159-26; 159-28 at 5-14).

[72] *Id.* at 11.

[73] R. Doc. 171 at 4-5 (citing *Slatten v. Royal Caribbean Cruises Ltd.*, 2014 WL 5500701, at *11-12 (E.D. La. Oct. 30, 2014)).

[74] *Id.* at 2-6.

violated regulations that imposed a clear legal duty to operate at a low speed to prevent breakaways.[75]  As a result, UBT contends the *Pennsylvania* Rule places the heavy burden of proving causation on the *Kokuka Glorious* Interests, requiring them to show that their negligence could not have contributed to the breakaway – a burden UBT contends is not met by the *Kokuka Glorious* Interests in their motion for summary judgment.[76]  Finally, UBT submits again that the Plaquemines Port mooring regulations are preempted by the U.S. Coast Guard regulations.[77]

The *Admiral Bulker* Interests reply in support of their motion for summary judgment, arguing that neither UBT nor Marquette genuinely disputes the objective data that shows the *Admiral Bulker* passed the UBT facility forty minutes prior to the breakaway, thus absolving the *Admiral Bulker* Interests from liability.[78]  The *Admiral Bulker* Interests urge the Court to consider Brooks' prior declarations as admissible under Rule 807 of the Federal Rules of Evidence, the residual exception to the hearsay rule, or, if inadmissible, as a form of evidence that Brooks may adopt at trial as a former statement.[79]

## III.    LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

---

[75] R. Doc. 180 at 2-3.
[76] *Id.* at 3-5.
[77] *Id.* at 5-7.
[78] R. Doc. 177 at 14-20.
[79] *Id.* at 4-13.

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Equal Emp't Opportunity Comm'n v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d

1069, 1075 (5th Cir. 1994) (en banc) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine dispute, the nonmovant must articulate specific facts and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

**B. Ingram's Motion for Summary Judgment**

"A barge owner has a 'continuing and nondelegable duty' to deliver a seaworthy barge to a fleeter." *Conagra, Inc. v. Weber Marine, Inc.*, 2000 WL 943198, at *4 (E.D. La. July 7, 2000) (citation omitted). An unseaworthy vessel is one that is not "reasonably fit and safe for the purposes for which it is to be used." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "A vessel's condition of unseaworthiness might arise from any number of circumstances," such as a "condition of the ship, her appurtenances, her cargo, or her crew." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499-500 (1971); *see*, *e.g.*, *Conagra*, 2000 WL 943198, at *4 ("A barge is unseaworthy if a line-attaching fixture on it has a latent and non-apparent defect which renders the fixture incapable of bearing reasonably anticipated stresses.").

When a barge is delivered to the fleeter, a bailment relationship is established, and the fleeter as bailee has a duty to exercise reasonable care of the barge. *See Dow Chem. Co. v. The Barge UM-23B*, 424 F.2d 307, 311 (5th Cir. 1970) (wharfinger was "a bailee for hire"). "A fleeter is responsible for the care of barges in its custody, and that includes a duty to ensure that the barges are adequately moored." *Conagra*, 2000 WL 943198, at *5 (citing *John I. Hay Co. v. The Allen B. Wood*, 121 F. Supp. 704, 708 (E.D. La. 1954)); *see also Am. River Transp. Co. v. Paragon Marine Serv., Inc.*, 213 F. Supp. 2d 1035, 1059 (E.D. Mo. 2002) ("The operator of a fleeting facility as bailee has the responsibility of caring for the barge after it is committed to its custody."). Accordingly, "[t]he custodian of a vessel that goes adrift and causes damage is faced with a legal presumption that the vessel was adrift through the custodian's negligence, and the custodian 'bears the burden of disproving fault by a preponderance of the evidence.'" *Conagra*, 2000 WL 943198, at *5 (quoting *James v. River Pars. Co.*, 686 F.2d 1129, 1132 (5th Cir. 1982)). The owner of a barge involved in a breakaway from a fleet can thus only be held liable if a fault or unseaworthy condition of the barge or other independent negligence of the owner caused or contributed to causing the breakaway. *See id.* at *4-5.

Here, it is undisputed that Ingram delivered the barges to the barge fleet facility owner and operator, UBT, on January 17, 2016, in seaworthy condition: no problems with Ingram barges were noted in any vessel logs upon delivery; Captain Glen Alexie, who conducted the initial inspection of the barges upon delivery, and Ricky Rosser, operations manager of Marquette, testified that if there was a problem with any barge, it would have been noted in the vessel log; and no issues were noted in the vessel logs from the time the barges were delivered on January 17 until the time of the breakaway on January 20.[80] Further, none of the liability expert reports in this

---

[80] R. Doc. 147-1 at 3 (citing R. Docs. 147-2; 147-4; 147-5).

case identifies a fault or unseaworthy condition on any barge or places fault on Ingram; and no witness has testified that Ingram's barges caused or contributed to the breakaway.[81]  No party has challenged this evidence.  Therefore, Ingram, as owner of the barges delivered to fleeter UBT, cannot be held liable for causing or contributing to the breakaway.  Ingram's motion for summary judgment is granted.

### C.  Evidentiary Presumptions Addressed in the Summary Judgment Motions

As a preliminary matter, the Court delineates the conflicting presumptions invoked by the parties to delimit their burdens of proof.  The *Kokuka Glorious* and *Admiral Bulker* Interests argue that UBT and Marquette, as custodians of the barges, bear the burden of disproving their fault under the *James* test – where "[t]he custodian of a vessel that goes adrift and causes damage is faced with a legal presumption that the vessel was adrift through the custodian's negligence, and the custodian 'bears the burden of disproving fault by a preponderance of the evidence.'" *Conagra*, 2000 WL 943198, at *5 (quoting *James*, 686 F.2d at 1132).

UBT and Marquette argue that under the *Pennsylvania* Rule the *Kokuka Glorious* and *Admiral Bulker* Interests bear the burden of disproving that their negligence caused or contributed to the breakaway and ensuing damages.  The *Pennsylvania* Rule instructs that a party who violates a statutory rule intended to prevent the maritime accident is presumed to have caused the accident. *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991); *see also Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir. 1982) (the *Pennsylvania* Rule "constitutes an evidentiary rule reversing the burden of proof").  "In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The Pennsylvania*, 86 U.S. 125, 136

---

[81] *Id.* at 3-4, 6.

(1874).  As an evidentiary presumption "designed to fill a vacuum," the *Pennsylvania* Rule, as other presumptions of fault in general maritime law, are inapplicable where "the parties have introduced evidence to dispel the mysteries that gave rise to the presumptio[n]."  *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005) (quoting *Rodi Yachts, Inc. v. Nat'l Marine, Inc.*, 984 F.2d 880, 887 (7th Cir. 1993)).

An additional presumption may favor the interests of UBT and Marquette.  "It is well established that a presumption of fault arises when a [vessel's] wake causes damage to a moored or anchored vessel …."  *Gregg v. Weeks Marine, Inc.*, 2000 WL 798493, at *4 (E.D. La. June 21, 2000) (citing *W. India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673, 674 (5th Cir. 1951)).[82]

In briefing the motions for summary judgment, all parties have presented evidence regarding fault and causation, while invoking one or more of the foregoing presumptions to urge that their burden of proof be eased or that their opponents' be increased.  Given these circumstances, it may be argued that the presumptions under the *Pennsylvania* Rule and under *West India*, as against the *Kokuka Glorious* and *Admiral Bulker* Interests, and under *James*, as against UBT and Marquette, do not apply.  *See, e.g.*, *In re Int'l Marine, L.L.C.*, 2013 WL 3293677, at *7-8 (E.D. La. June 28, 2013) (where evidence presented regarding fault and causation, general maritime law presumptions did not apply).  And any application of these conflicting presumptions may well be said to "merely cancel each other out."  *Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 606 (5th Cir. 2010) (citing *Rodi Yachts*, 984 F.2d at 887).  However, before arriving at any such conclusion, the Court would need the benefit of briefing by the parties directed to the issue.  Accordingly, at this time, the Court declines to apply the proposed presumptions in resolving the motions for summary judgment.

---

[82] This may be less a presumption than the first step of the legal standard applied in wave wash cases.

### D.  The *Kokuka Glorious* Interests' Motion for Summary Judgment

Under general maritime law, a plaintiff must prove that (1) the defendant owed a duty to

the plaintiff, (2) the defendant breached that duty, (3) the breach actually and proximately caused

the plaintiff's injury, and (4) the plaintiff sustained an injury.  *Franza v. Royal Caribbean Cruises,*

*Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014); *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d

201, 211 (5th Cir. 2010).  To succeed on a maritime negligence claim for damage caused by wave

wash, a plaintiff must establish that the defendant operated the vessel negligently and that this

negligence created an excessive wake or swell that caused damage.  *Gregg*, 2000 WL 798493, at

*4.  "The facts and circumstances of each particular case determine whether a vessel is responsible

for damages created by her swells."  *Id.* (citing *Moran v. The M/V Georgie May*, 164 F. Supp. 881,

885 (S.D. Fla. 1958)).  "A moving vessel owes a duty of reasonable care to appreciate the

reasonable effect of its wake and to take reasonable precautions to avoid creating unusual swells

that may injure others."  *Id.* (citations omitted).  In the context of property damage:

> A ship passing piers or docks where other vessels are tied up is obligated to proceed
> carefully and prudently so as to avoid creating unusual swells or suction which
> would damage craft properly moored or installations along the shoreline.  The
> moving vessel must take into consideration the reasonable effects to be anticipated
> from its speed and motion through the water and must take such precautions by way
> of reduction of speed or alteration of course as may be reasonably necessary to
> prevent such damage.

*New Orleans Steamboat Co. v. M/T Hellespont Glory*, 562 F. Supp. 391, 392 (E.D. La. 1983)

(quoting *Shell Pipe Line Corp. v. M/V CYS Alliance*, 1982 AMC 389, 395 (E.D. La. 1981)).

Nevertheless, "[m]oored vessels are also under some duty to protect themselves," being required

to be "seaworthy and properly moored so as to resist ordinary and normal swells in narrow waters

where heavy traffic may be anticipated.  Some wash from passing vessels is bound to occur and

must be anticipated and guarded against.  Only unusual swells or suction which cannot be

reasonably anticipated furnish the basis for a claim." *Id.* at 393 (quoting *Shell Pipe Line*, 1982 AMC at 395-96). In the event that the damage is caused by a passing vessel's negligent wake and an improperly moored vessel, liability is determined by comparative fault. *See, e.g.*, *Creole Shipping, Ltd. v. Diamandis Pateras, Ltd.*, 554 F.2d 1348, 1349 (5th Cir. 1977) (affirming apportionment of fault to vessel traveling at excessive rate of speed and vessel moored with slack lines).

The *Kokuka Glorious* Interests argue that no genuine issue of fact exists as to whether the wake created by the *Kokuka Glorious* was reasonable or as to whether the barges were improperly moored to withstand reasonable wakes. UBT and Marquette contend that the evidence shows that the *Kokuka Glorious* proceeded at excessive speeds for the high-water conditions, thereby creating an unreasonable wake that caused or contributed to the breakaway, and also that the *Kokuka Glorious* violated several regulations aimed at preventing damage to moored ships in high-water conditions. UBT also points to evidence showing that its barges were properly moored to withstand a reasonable wake. While the *Admiral Bulker* Interests argue that UBT is solely at fault, they also aver that Brooks identified the *Kokuka Glorious* as the offending vessel rather than the *Admiral Bulker*.

The Court agrees with UBT and Marquette that genuine disputes of fact exist, on the one hand, as to whether the speed and location of the *Kokuka Glorious* in passing the barges were reasonable in the particular circumstances, and on the other hand, as to whether the barges were properly moored. UBT and Marquette point to abundant testimony and records showing that the *Kokuka Glorious* passed the barges at a high rate of speed, which could have been excessive in the high-water conditions present on the date of the incident given regulations directing vessels to "proceed at slowest safe speed." Moreover, data generated by the experts tends both to corroborate

and undermine Brooks' testimony as the only eyewitness to the breakaway. Furthermore, the *Kokuka Glorious* Interests rely upon Brooks' testimony to exonerate it from liability by arguing that Brooks unquestionably identified an upriver vessel as the source of the damaging wave. But the *Admiral Bulker* Interests dispute that Brooks actually saw the *Admiral Bulker*, and other evidence indicates that the dispute is genuine. Credibility determinations are properly reserved for resolution at trial, where the Court can properly weigh Brooks' testimony for any inconsistencies and evaluate it against other evidence including objective data and the testimony of expert witnesses. *See Manson Gulf, L.L.C. v. Modern Am. Recycling Serv., Inc.*, 878 F.3d 130, 136 (5th Cir. 2017) (grant of summary judgment improper where sole eyewitness presented "divergent testimony" on "key issues"); *Delta & Pine Land Co.*, 530 F.3d at 398-99. Thus, there exist genuine issues of fact as to the operation of the vessels, their responsibility for creating any wave wash, and the effect of any such wave wash.

Additionally, UBT and Marquette present evidence to dispute the contention that the fleet was improperly moored. UBT admits that it did not have a downstream buoy for its 1B tier of barges in violation of the Plaquemines Parish Tariff, which required fleeters to use a second mooring buoy to secure the downstream end of moored barge tiers when (as in this case) the Carrollton gauge exceeded twelve feet.[83] For its part, UBT argues that the Plaquemines Parish Tariff was preempted by U.S. Coast Guard regulations.[84] The Court need not decide whether the Plaquemines Parish Tariff is inapplicable as preempted at this juncture, however, because the issue "has not been adequately briefed on this motion." *Slatten, LLC*, 2014 WL 5500701, at *5 (concluding likewise as to the same parish regulation in the face of argument by the same parties, UBT and Marquette). UBT provides testimony that the 1B Buoy moorings were regularly

---

[83] R. Docs. 148-2 at 49-50; 148-3 at 4; 156-16 at 3.
[84] R. Doc. 156-15 at 15-20.

checked; that the 1B Buoy's plasma lines were replaced in mid-December 2015, approximately one month before the breakaway; that Tommy Rester, captain of one of Marquette's fleet boats at the UBT facility, inspected the 1B Buoy the morning of the incident and saw no problems; that Tim Aucoin, captain of another Marquette fleet boat, performed a fleet check of the entire UBT barge fleet the morning of the incident and observed no problems; and that no major problems were reported throughout the month leading up to the incident.[85]  This evidence establishes genuine issues of material fact as to the mooring of the barge fleet.

Further, in the event that the breakaway was caused by both negligence of the passing vessels and negligence in the mooring of the fleet, liability shall be apportioned according to principles of comparative fault – an exercise that necessarily requires sorting through disputed issues of fact.  *See Hebert v. Specialized Envtl. Res. LLC*, 2013 WL 1215443, at *5 (E.D. La. Mar. 25, 2013) (denying summary judgment where disputes of fact existed on question of comparative fault); *see also New Orleans Steamboat Co.*, 562 F. Supp. 391 (allocating fault between moored and passing vessels after bench trial).  Thus, summary judgment at this stage is inappropriate.

### E.  The *Admiral Bulker* Interests' Motion for Summary Judgment

The *Admiral Bulker* Interests argue that it is impossible for claimants to prove that its wake caused or contributed to the breakaway because certain data places the *Admiral Bulker* as having passed the UBT facility at 11:50 a.m., forty minutes before the breakaway.  Marquette and UBT urge the Court to deny summary judgment because the *Admiral Bulker* Interests cannot prove the vessel's operation was not a contributing cause of the accident under the *Pennsylvania* Rule due to the *Admiral Bulker*'s excessive speed, Brooks' having testified that an upbound vessel caused the breakaway, and the possibility that the 1B Buoy's moorings were parted by the *Admiral*

---

[85] R. Doc. 156 at 12-15 (citing R. Docs. 156-8 at 2-6; 156-10; 156-11; 156-12; 156-13).

*Bulker*'s actions, even if the barges did not drift into the river until after the *Kokuka Glorious* passed. Marquette and UBT also argue that summary judgment is inappropriate because the Court cannot weigh the evidence or make credibility determinations on a motion for summary judgment.

As with the *Kokuka Glorious* Interests' motion for summary judgment, the Court concludes that genuine disputes of material fact exist concerning whether the *Admiral Bulker*'s negligence caused or contributed to the breakaway, and whether the barges were properly moored. To grant summary judgment would require the Court to weigh the evidence and make credibility determinations about Brooks and the expert witnesses – an inappropriate course of action on this motion. *See Manson Gulf, L.L.C.*, 878 F.3d at 136.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Ingram's motion for summary judgment (R. Doc. 147) is GRANTED, and all claims brought against Ingram by the Vessel and Cargo Interests (R. Docs. 1 [Case No. 16-17745], 57 [Case No. 16-16215], and 109 [Case No. 16-16215]) are hereby DISMISSED WITH PREJUDICE;

IT IS FURTHER ORDERED that the *Kokuka Glorious* Interests' motion for summary judgment (R. Doc. 148) is DENIED; and

IT IS FURTHER ORDERED that the *Admiral Bulker* Interests' motion for summary judgment (R. Doc. 149) is DENIED.

New Orleans, Louisiana, this 19th day of June, 2019.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE